**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

LAWRENCE BRANCH                                          PETITIONER

V.                                                    NO.: 4:07CV138-MPM

CHRISTOPHER EPPS, ET AL.                                 RESPONDENTS

## MEMORANDUM OPINION & ORDER

Lawrence Branch, the petitioner in this action, was convicted of the capital murder of

Dorothy Jorden in the Circuit Court of Carroll County, Mississippi, and sentenced to death. The

Mississippi Supreme Court affirmed the verdict and sentence on direct appeal. *See Branch v.*

*State*, 882 So.2d 36 (Miss. 2004) ("*Branch I*"). Petitioner sought post-conviction relief and was

denied. *Branch v. State*, 961 So.2d 659 (Miss. 2007) ("*Branch II*"). Thereafter, Petitioner timely

filed a petition for a writ of habeas corpus in this Court. The Court, having fully considered

Petitioner's claims and the responses thereto, vacates Petitioner's sentence of death for the

reasons that follow.

### Facts

Dorothy Jorden owned and operated Dot's Burger Bar, a restaurant and club located next

to her home in Coila, Mississippi. Jorden closed business at around 3:00 a.m. on January 21,

2001, and her body was discovered inside of her home later that afternoon. She had been beaten

to death. Upon investigation, police learned that two of the customers at Dot's the previous

evening, Petitioner and his cousin, Deondray Johnson, left Dot's at around 1:30 a.m. with a

promise to return to give two other patrons a ride home. They failed to return as promised.

Petitioner and Johnson were questioned and gave conflicting statements as to their whereabouts the previous evening. Upon additional questioning, Petitioner confessed that he and Johnson robbed and murdered Jorden. Both Petitioner and Johnson were arrested.

Petitioner's murder trial began on May 20, 2002. Petitioner testified at trial that he was with Johnson on January 20, 2001, but he denied any involvement in the murder. Petitioner was convicted of capital murder on May 22, 2002. The jury returned a sentence of death on May 23, 2002.[1]

## Applicable Standard

The instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which allows federal habeas review of a petitioner's claims alleging a "violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The AEDPA precludes a federal court from granting a petition for a writ of habeas corpus on any claim "adjudicated on the merits in State court proceedings" unless that adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2); *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1398 (2011).

A decision is "contrary to" the applicable law when the conclusion reached by the state court is "opposite that reached by the Supreme Court on a question of law or if the court decides

---

[1] Johnson was separately tried and convicted of capital murder. The trial court imposed a sentence of life imprisonment without the possibility of parole after Johnson's jury failed to agree on a punishment. *See, e.g., Johnson v. State*, 885 So.2d 72 (Miss. App. 2004).

the case differently on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). The "unreasonable application" clause allows a court to grant relief if the state court identifies the correct legal principle but unreasonably applies it to the facts of a petitioner's case. *Id.* Whether either of the § 2254(d) clauses is met is determined by assessing the record that was before the state court. *See Holland v. Jackson*, 542 U.S. 649, 652 (2004); *see also* 28 U.S.C. § 2254(d)(2). Factual determinations made by a state court are presumptively correct, and a petitioner bears the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 343 (2003). This deference is afforded to both the express and implicit factual findings of the state court. *See, e.g., Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006).

The standards of the AEDPA are "highly deferential" and "demand[] that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, ___ U.S. ___, 130 S. Ct. 1855, 1862 (2010) (internal citation and citation omitted). The federal habeas court's inquiry is not whether the decision of the state court is incorrect, but "whether that determination was unreasonable - a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) Unless a petitioner can demonstrate that there is no reasonable basis for the state court decision denying relief, federal habeas relief is precluded. *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 784 (2011).

Because federal habeas review is a review of the determination reached by the state court, a petitioner must ordinarily exhaust his claims in state court prior to seeking federal habeas relief. *See* 28 U.S.C. § 2254(b)(1). Additionally, if a petitioner fails to present his claim in compliance with state procedural rules, the claim is barred on federal habeas review. *See Coleman v.*

3

*Thompson*, 501 U.S. 722, 729 (1991).  If either failure occurs at the state court level, a federal court may review the claim in one of two instances: (1) if the petitioner shows cause for the default and actual prejudice as a result, or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent.'"  *Dretke v. Haley*, 541 U.S. 386, 393 (2004) (citation omitted); *see also Walker v. Martin*, ___ U.S. ___, 131 S. Ct. 1120, 1127 (2011).

The Court now considers Petitioner's claims in light of the foregoing standards.

## I.  Mental Retardation

Petitioner claims that he suffers from mental retardation and is exempt from the death penalty.  In *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), the United States Supreme Court held that the execution of offenders with mental retardation[2] is proscribed by the Eighth Amendment to the United States Constitution.  The Court found that due to the necessarily reduced culpability of persons with mental retardation, the dual societal purposes of deterrence and retribution would not be served by their execution.  *Atkins*, 536 U.S. at 319-20.

Prior to *Atkins*, many states had adopted standards restricting the execution of the mentally disabled.  *Atkins* notes that these states generally followed the diagnostic criteria set forth by the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association ("APA").  *See id.* at 317 and n.22.  Under either standard, there are three components for a determination of mental retardation: (1) substantial limitations in intellectual functioning; (2) significant limitations in particular adaptive skill areas; and (3) manifestation of

---

[2]  The American Association on Mental Retardation ("AAMR") is now the American Association on Intellectual and Developmental Disabilities ("AAIDD").  The AAIDD currently uses the term "intellectual disability" instead of mental retardation.  For purposes of continuity and clarity in this opinion, the Court uses the term "mental retardation" and will refer to the professional organization as AAMR.

4

those limitations before age 18. *See id.* at 309 n.3 (noting the similarity between the professional standards); *see also Clark v. Quarterman*, 457 F.3d 441, 446 (5th Cir. 2006). While the *Atkins* Court recognized a growing societal interest in protecting the mentally retarded from execution, it allowed the individual states to adopt means to enforce the constitutional restriction. *See Atkins*, 536 U.S. at 317.

In *Chase v. State*, 873 So.2d 1013, 1028-29 (Miss. 2004), the Mississippi Supreme Court set forth a definitive standard for how *Atkins* is applied in trial courts. Pursuant to the *Chase* standard, a determination of mental retardation is to be made by the trial judge, by a preponderance of the evidence, after evidence is presented by both the defendant and State. *Id.* The Mississippi Supreme Court held that:

> [N]o defendant may be adjudged mentally retarded for purposes of the Eighth Amendment, unless such defendant produces, at a minimum, an expert who expresses an opinion, to a reasonable degree of certainty, that:
> 1. The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association;
> 2. The defendant has completed the Minnesota Multiphasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.

*Id.* at 1029.

The court also determined that those offenders whose trials were final prior to *Chase* could obtain an evidentiary hearing by attaching to their petition an affidavit from a qualified psychologist "who opines, to a reasonable degree of certainty, that: (1) the defendant has a combined Intelligence Quotient ("IQ") of 75 or below, and; (2) in the opinion of the expert, there is a reasonable basis to believe that, upon further testing, the defendant will be found to be mentally retarded, as defined herein." *Id.* A few months later, the court "expand[ed] on the procedure to be used in reaching a determination of mental retardation" by holding that the entire

record would be considered before "deciding whether to grant an *Atkins* hearing." *Wiley v. State*, 890 So.2d 892, 897 (Miss. 2004). Shortly thereafter, the Mississippi Supreme Court noted that in cases already pending before the procedure in *Chase* was handed down, it had ordered a hearing without requiring an expert's affidavit where the record contains "a qualified opinion" that an offender is mentally retarded. *Scott v. State*, 878 So.2d 933, 948 (Miss. 2004).

When Petitioner was five years old, he was referred by his teachers to the Region VI Mental Health-Mental Retardation Center in Greenwood, Mississippi, where he was evaluated and diagnosed with mild mental retardation. (*See* Pet. Memo Ex. A). At a pretrial hearing held in his capital murder trial in 2002, defense counsel moved for a psychiatric evaluation to determine whether Petitioner's IQ exceeds 70. (Trial Tr. vol. 1, 23-26). The trial court granted the motion and determined that the evaluation would also encompass issues relevant to Petitioner's competency and sanity. (Trial Tr. vol. 1, 26, 27-29; *see also* SCP vol. 1, 34-35). Dr. W. Criss Lott evaluated Petitioner on February 28, 2002. (*See* Pet. Memo Ex. B). He found Petitioner's full-scale IQ score to be 84, his reading ability to be at a high school level, and his mathematic skills to be at a sixth grade level. (*Id.*). In his report to the trial judge, Dr. Lott noted that Petitioner's "history of mental retardation (diminished cognitive abilities during childhood)" should be considered as a non-statutory mitigating factor (*Id.*). Defense counsel did not object to Dr. Lott's findings, and no evidence of Petitioner's intellectual deficits was presented in mitigation at trial.

Less than a month after Petitioner filed a motion for a new trial, the United States Supreme Court handed down *Atkins*. Petitioner did not move to amend his motion for a new trial to include an *Atkins* claim, and his prior motion was denied on July 16, 2002. (Trial Tr. vol. 8,

6

877-887).  He did raise an *Atkins* claim on direct appeal to the Mississippi Supreme Court on

March 31, 2004.  The court found that Petitioner was barred from bringing the claim for his

failure to present the issue to the trial court in a post-trial motion but stated it would "consider

the merits" of the claim, "[i]nasmuch as [the] issue is raised in the direct appeal of a capital

case[.]"  *Branch I*, 882 So.2d at 49-50.  The court found that "[w]hile Branch may have

manifested intellectual limitations at the age of five, he does not have substantial limitations in

present functioning which 'exist [] concurrently with related limitations in'" the applicable

adaptive skill areas.  *See id.*  The court stated that when he was evaluated in 2002, Petitioner

"was appropriately groomed and properly maintained personal hygiene, possessed a driver's

license, was responsible for buying clothing, groceries, and personal items.  He completed school

through the 9th grade and attended GED classes.  Branch was employed at the time of his arrest.

Branch performed household chores for relatives and people in the neighborhood.  He helped

raise money for the church and community.  Under these facts, Branch has not made a prima

facie showing that he falls within the category of persons protected under *Atkins*."  *See id.*

Seven days before Petitioner's direct appeal was denied, the Mississippi Supreme Court

set forth the procedure to be followed for convicted offenders seeking to raise a challenge to their

death sentences pursuant to *Atkins*.  *See Chase v. State*, 873 So.2d 1013 (Miss. 2004).  When

Petitioner moved for rehearing from the rejection of his appeal on July 7, 2004, he attached to it

the affidavit[3] of psychologist Dr. Daniel H. Grant, who stated that all the documents submitted to

him for review "support a diagnosis of mental retardation."  (Pet. Memo Ex. C, Aff. of Daniel H.

Grant).  He stated that as he had not been afforded the opportunity to evaluate Petitioner,

---

[3] The Court notes that the document, while sworn, is not dated.

however, he could not offer a conclusive diagnosis. (*See id.*). He stated that "it appears that Mr. Branch has significant intellectual and adaptive deficits," and noting the definitive prior diagnosis, he determined that full testing was necessary to accurately assess the issue and render a conclusive opinion. (*See id.*). The court granted the State's motion to strike the exhibit, and rehearing was denied. (*See* "Order" filed September 30, 2004, Pleadings Brief, No. 2002-DP-01315-SCT).

Petitioner later filed for post-conviction relief, and on September 22, 2005, he filed a petition for a stay of the proceedings in order to allow him to complete investigations prior to the statute of limitations deadline of October 7, 2005. (*See* "Petition for Extraordinary Relief and Equitable Stay, filed September 22, 2005, Pleadings Brief, No. 2004-DR-01086-SCT). Attached as an exhibit to his motion was the affidavit of Dr. Marc L. Zimmermann, who had been retained to evaluate Petitioner. (*See id.*, Ex. F, Aff. of Dr. Marc L. Zimmermann, September 22, 2005). The Mississippi Supreme Court denied Petitioner's motion to stay, noting that the brief was already past due and that no request for an extension of time had ever been made. (*See* Pleadings Brief, "Order", September 23, 2005).

When Petitioner presented a motion for post-conviction relief on October 7, 2005, he argued that his claim of mental retardation was not barred, as he had not been given an opportunity to comply with *Chase*. On March 24, 2006, Petitioner filed a "Motion to Amend Petition for Post-Conviction Relief with Exhibits and Proposed Amendment." (*See* Pleadings Brief, No. 2004-DR-01086-SCT). Included in the proposed amendment were the affidavits and reports of Dr. Zimmermann and licensed social worker Adriane Dorsey Kidd, who conducted a psychosocial evaluation of Petitioner. Counsel attached the documents to the petition for relief.

8

(*See* Pet. Memo Ex. D, E, F).[4]   In an addendum to his psychological evaluation, Dr.

Zimmermann opines that Petitioner "meets all criteria for a diagnosis of mental retardation."

(Pet. Memo Ex. D).  On June 1, 2006, the Mississippi Supreme Court, sitting *en banc*, granted

Petitioner's motion to amend, and the amended petition containing the expert opinions was filed.

(*See* "Order," Pleadings Brief No. 2004-DR-01086-SCT).

In its opinion on post-conviction review, the Mississippi Supreme Court rejected

Petitioner's claim that he should be allowed to present evidence complying with *Chase* in

support of his claim of mental retardation.  *Branch II*, 961 So.2d at 663-64.  The court found that

*Chase* was handed down seven weeks after Petitioner's direct appeal was submitted and one

week before the direct appeal was decided on May 27, 2004.  *See id.* at 664.  The court noted that

it had struck the undated affidavit from Dr. Grant that Petitioner filed along with his motion for

rehearing, and that the same document was attached, this time unsigned, to his petition for post-

conviction relief.  *See id.*  The court recited its opinion on direct appeal to demonstrate that

Petitioner's claim had been presented and alternately considered on its merits.  *See id.* at 664-65.

The court found that Petitioner's claims were res judicata, and that Petitioner had not complied

with "the necessary procedures nor provided the necessary documentation to rightfully comply"

with *Chase.  See id.* at 666.[5]  Relief was denied.

Despite objection from the State, this Court found that Petitioner was entitled to an

---

[4] The pleadings volumes are not consecutively paginated, and these affidavits and documents appear numerous times in various filings.  Therefore, where the same document is also filed as an exhibit to the instant petition, the Court will refer to its designation on habeas for ease of reference.

[5] Presiding Justice Diaz, joined by Justice Graves, dissented and would have granted Petitioner a hearing.  *See id.* at 668-69.

evidentiary hearing on his claim, inasmuch as Petitioner presented a prima facie showing of mental retardation in compliance with the requirements of *Chase* and was denied a hearing. (*See* docket entry no. 54, "Order Setting Evidentiary Hearing on Petitioner's Claim under *Atkins v. Virginia*, 536 U.S. 304 (2002)"). This Court found that Dr. Zimmermann's affidavit filed with the amended petition for post-conviction relief fully complied with *Chase*'s requirements. It determined that the majority of the Mississippi Supreme Court never mentioned the supplemental proof offered by Petitioner and instead noted that the claim presented on post-conviction review was "identical" to that raised and rejected on direct appeal. *Branch II*, 961 So.2d at 667 n.4. The Court also found, on the basis of the record, that the Mississippi Supreme Court's decision was unreasonable, both in light of the facts presented and in light of clearly established federal law. (*See* docket entry no. 54). Therefore, it determined to hold an evidentiary hearing and to review Petitioner's claim without the deference ordinarily afforded under the AEDPA. *See, e.g., Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007).

The Court ordered an evidentiary hearing and granted the State's request to allow Dr. Gilbert Macvaugh, III, to conduct an *Atkins/Chase* evaluation of Petitioner. (*See* docket entry no. 62). Dr. Macvaugh subsequently conducted an evaluation of Petitioner and determined that Petitioner meets the standard for mental retardation as contemplated by *Atkins*. The State has now filed a notice confessing that Petitioner suffers from mental retardation. (*See* docket entry no. 64).

In light of Petitioner's submitted proof and the State's concession, the Court will not here engage in a detailed analysis of the evidence on this issue. Rather, it finds that proof exists in the record to support a determination that Petitioner has met each prong of the clinical criteria for a

10

diagnosis of mental retardation by a preponderance of the evidence.

## A.  Significantly subaverage general intellectual functioning

The APA states that "[s]ignificantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean)."  *See DSM-IV-TR* at 41.  Petitioner's intellectual functioning has been assessed on four known occasions using the Stanford-Binet Intelligence Scale and successive versions of the Wechsler Adult Intelligence Scale ("WAIS").  The United States Supreme Court has recognized the Wechsler Scales as the "standard instrument in the United States for assessing intellectual functioning."  *Atkins*, 536 U.S. at 309 n.5.  Taking the approximately five point standard error of measurement into account, the typical cutoff score for the intellectual functioning prong of the definition is an IQ between 70 and 75 or lower. *Atkins*, 536 U.S. at 309 n.5; *see also DSM-IV TR* at 39, 41.

In 1985, Petitioner obtained a full-scale IQ score of 68 (*See* Pet. Memo Ex. A).   In 2002 on the WAIS-III, he obtained a full-scale IQ score of 84.  (*See* Pet. Memo Ex. B).  In 2005, he obtained a full-scale IQ score of 68 on the WAIS-III.  (*See* Pet. Memo Ex. D).  In 2011, he obtained a full-scale IQ score of 60 on the WAIS-IV.

Dr. Macvaugh states in his report that a review of the test data from Dr. Lott's evaluation in 2002 reveals that a student administered the intelligence testing and made several errors in scoring and administration that make the report invalid.  (Macvaugh Rept. 14-15).  Discounting the invalid 2002 score, the remainder of Petitioner's obtained scores fall within the range of mild mental retardation.  This Court determines that Petitioner has demonstrated by a preponderance of the evidence that he suffers from significantly subaverage intellectual functioning.

**B. Significant limitations in adaptive functioning[6]**

A diagnosis of mental retardation requires significantly subaverage general intellectual functioning "that is accompanied by significant limitations in adaptive functioning in at least two [] skill areas." *DSM-IV-TR* at 41. Significant limitations in adaptive functioning "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." *Id.* at 40. Persons with mild mental retardation can develop social, communication, and minimal sensorimotor skills at an early age such that they are not distinguished from normally functioning individuals until later in life. Harold L. Kaplan & Benjamin J. Saddock, *Synopsis of Psychiatry: Behavioral Sciences/Clinical Psychiatry* 1138 (8th ed. 1998). During their school years, persons with mental retardation can learn academic skills up to the approximately sixth-grade level, and by their late teens may be "guided toward social conformity." *Id.* As an adult, they can "usually achieve social and vocational skills adequate to minimum self-support but may need guidance and assistance when under unusual social or economic stress." *Id.* The definitions of the *DSM-IV-TR* and the 1992 *AAMR* use the same categories of skill areas to be considered.[7] These adaptive skill areas are: (1)

_____

[6] All of the adaptive skill deficits found by the experts are not discussed herein, though the areas of deficits are recounted in each report/affidavit filed by the experts.

[7] The 1992 *AAMR* combines "health and safety" into one category while the *DSM-IV-TR* separates them into two categories. As such, the *AAMR* uses ten categories while the *DSM-IV-TR* references eleven. In 2002, the *AAMR* re-designated the skill areas into three categories: conceptual, social, and practical. 2002 *AAMR* 73. A clinician making a diagnosis using the 2002 edition determines whether the individual scores two standard deviations or more below the mean in one of the three adaptive behavior skill areas to determine if that individual's limitation is significant. *See* 2002 *AAMR* at 78.

communication; (2) self-care; (3) home living; (4) social skills; (5) community use; (6) self-direction; (7) health; (8) safety; (9) functional academics; (10) leisure; and (11) work.  *See, e.g.*, *DSM-IV-TR* at 41; 1992 *AAMR* at 5.

Both Dr. Zimmermann and Dr. Macvaugh found Petitioner to suffer significant deficits in communication and functional academics.  (*See* Pet. Memo Ex. D; Macvaugh Rept. 35). Petitioner failed the fifth and sixth grades and failed the GED exam.  (*See id*).   In standardized achievement testing, Dr. Zimmermann found Petitioner's academic abilities to be at or below a third grade level, while Dr. Macvaugh found Petitioner's skills "no higher than the 6th grade level in all areas assessed."  (*See* Pet. Memo Ex. D; Macvaugh Rept. 35-36).  Dr. Macvaugh also noted that Petitioner's trial testimony was  "replete with instances in which he had obvious difficulties understanding and responding to fairly simple questions asked of him."  (Macvaugh Rept. 36). Both experts also noted Petitioner's limitations in caring for himself.  Dr. Zimmermann found it significant that Petitioner's family members handled money and made decisions for him, while Dr. Macvaugh noted that Petitioner required assistance in getting a driver's license and in obtaining his two semi-skilled employment positions.  (*See id.*).  Dr. Macvaugh also noted that Petitioner appears to suffer significant deficits in reasoning abilities, as he was unable to successfully look up numbers in a telephone book, fill out a check, address an envelope, or look at a clock and determine the time.  (*See id.* at 36).

In light of these findings, the Court finds Petitioner has met his burden of demonstrating by a preponderance of the evidence that he suffers from significant limitations in at least two adaptive skill areas identified by the *DSM-IV-TR* and the 1992 *AAMR*, and in at least one area as identified by the 2002 *AAMR*,  prior to the age of 18.

13

**C.  Onset "before age 18 years"**

Both Dr. Zimmermann and Dr. Macvaugh opined that the onset of Petitioner's condition occurred prior to his reaching eighteen years of age.  Petitioner was assessed for mental retardation at the age of five, and he was administered an adaptive behavior instrument, the Vineland Social Maturity Scale, at that time.  Petitioner's scores on the Vineland and his diagnosis of mental retardation at the age of five indicate that he had intellectual and adaptive deficits before the age of eighteen.  (*See* Pet. Memo Ex. D; Macvaugh Rept. 36).  Petitioner has shown by a preponderance of the evidence that mental retardation was present before he turned eighteen years old.

**D.  Malingering**

Dr. Macvaugh administered the Test of Memory Malingering ("TOMM") as a malingering measure and found no evidence that Petitioner appeared to be malingering adaptive deficits.  (*See* Macvaugh Rept. 33).

Therefore, Petitioner has shown by a preponderance of the evidence that he satisfies the criteria for a diagnosis of mental retardation within the meaning of *Atkins v. Virginia* and *Chase v. State*, and he is entitled to have his sentence of death vacated.[8]

## II.  Assistance of Counsel

Petitioner maintains that his trial counsel performed ineffectively pre-trial and at trial.  In order to demonstrate that he received the ineffective assistance of counsel in violation of his rights

---

[8] In his federal habeas petition, Petitioner raised  additional claims relating to the sentencing phase of his trial.  Because the Court vacates Petitioner's sentence of death on the ground of mental retardation, these issues are rendered moot and will not be addressed in this opinion.

under the Sixth Amendment, Petitioner must demonstrate that counsel performed deficiently, and that his defense was prejudiced as a result of the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The Court presumes that counsel exercised an objectively reasonable professional judgment, and it reviews counsel's behavior in light of counsel's perspective at the time of the conduct and in light of "prevailing professional norms." *Id.* at 687, 689-90. Errors by counsel warranting relief are only those "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Prejudice is shown where a petitioner demonstrates a reasonable probability of a different outcome absent the errors. *Id.* at 694. This inquiry is not solely outcome related, however, as the concern is whether counsel's errors deprived the petitioner of a fair or reliable result. *See Lockhart v. Fretwell*, 506 U.S. 364, 368-69 (1993). Where a *Strickland* claim has been presented in a state court and adjudicated on its merits, federal court review is "doubly deferential" and asks "'whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S. Ct. 1388, 1426 (2011) (quoting *Harrington v. Richter*, 526 U.S. ___, ___, 131 S. Ct. 770, 788 (2011)).

## A. Voluntariness of statement

Petitioner argues that trial counsel rendered ineffective assistance in failing to present evidence of his intellectual disability when moving to suppress his confession. He maintains that his confession was the only evidence linking him to the crime and was the lynchpin for the introduction of evidence concerning Deondray Johnson. Petitioner contends that he was prejudiced by counsel's failure because the jury never had the opportunity to consider the effect of his disability on the voluntariness or reliability of his statements. He otherwise argues that

counsel should have pointed out the exculpatory portions of his statement once the confession was admitted. The Mississippi Supreme Court rejected Petitioner's claim on direct appeal, finding that counsel did the best it could to suppress Petitioner's statement on the basis of allegations of physical and psychological intimidation. *Branch I*, 882 So.2d at 60-62.

Defense counsel moved to suppress Petitioner's statement to police on the basis that it was involuntarily given, taken in violation of his right to counsel and to remain silent, and taken after an unconstitutionally prolonged detention. (*See* Pet. Memo Ex. V). Defense counsel did not seek a release of Petitioner's records until the day of the suppression hearing, when counsel obtained permission from Petitioner and his mother for the release of his mental health records. (*See* Pet. Memo Ex. S; *see also* Trial Tr. vol. 2, 30). At the suppression hearing, Deputy Michael Spellman testified that on each occasion before Petitioner was interviewed, Petitioner was advised of his rights and voluntarily executed a waiver without pressure, threats, or promises. (*See id.* at 31-33; 34-38; 65-66). Sheriff Gray and Deputy Miskelly also testified that no threats were made to Petitioner during the time he was questioned or transported for questioning. (*See id.* at 67-70).

Petitioner testified at the suppression hearing that law enforcement officials entered his home and took evidence without permission. (*See id*. at 39-40). He also testified that he was read his rights, though he did not really understand them, and that the deputies brandished their weapons and insinuated harm might come to his family if he did not cooperate. (*See id.* at 39-43). Petitioner maintained that the deputies told him how the crime occurred, and that he only repeated their statements on videotape out of fear that he and his family would be killed otherwise. (*See id.* at 43-44). On cross-examination, he admitted that he was advised of his rights three different times. (*See id*. at 46).

16

Neither defense counsel nor the prosecution asked to be heard further on the motion. (*Id*. at 71). The trial court found that Petitioner "freely and voluntarily gave a statement, and the same was not coerced by any officer of the law." (*See id*. at 71-72). The defense motion was overruled, and Petitioner's videotaped statement was introduced against him at trial.

Voluntariness under the Due Process Clause is assessed by inquiring "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (citation omitted); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (holding that voluntariness is assessed under the totality of the circumstances). A statement is voluntary if it is the "product of a free and deliberate choice" that is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). In the absence of coercive police tactics, the statement is not constitutionally involuntary merely because Petitioner's intellectual functioning is impaired. *See Colorado v. Connelly*, 479 U.S. 157, 164 (1986). The trial court found Petitioner's statement freely given and rejected Petitioner's allegations of police overreaching. The record provides a factual basis for the trial court's decision. *See Pemberton v. Collins*, 991 F.2d 1218, 1225 (5th Cir. 1993) "stating [w]hether the police engaged in the coercive tactics alleged by the defendant is a subsidiary fact; as such, the trial court's finding is entitled to deference if it is supported in the record." (citation omitted). Inasmuch as Petitioner's allegation of coercion was rejected, evidence of Petitioner's prior diagnosis of mental retardation would not have led to the suppression of the statement.

Additionally, the Court finds that the record supports a conclusion that defense counsel did attempt to use the exculpatory facts in evidence to further the defense in this case. Petitioner's

17

counsel did contest the DNA evidence on relevancy grounds and presented testimony to show that it was Johnson, not Petitioner, who was the principal actor in the murder.

Petitioner has not demonstrated that his statement would have been suppressed as involuntary if counsel had presented evidence of his mental deficiencies, or that counsel's use of the admitted videotaped statement warrants federal habeas relief. Petitioner has failed to demonstrate that the Mississippi Supreme Court's rejection of this claim is unreasonable, and Petitioner will be denied relief on this claim.

**B. Constitutionality of arrest**

Petitioner maintains that he gave an inculpatory statement to police only after his warrantless arrest, and that his trial counsel performed ineffectively in failing to seek the suppression of his custodial statement as the fruit of an illegal seizure. On direct appeal, the Mississippi Supreme Court rejected his claim. *Branch I*, 882 So.2d at 60.[9]

The Fourth Amendment guarantees an individual's right "to be secure . . . against unreasonable searches and seizures." U.S. CONST. amend. IV. A warrantless arrest is a seizure within the meaning of the Fourth Amendment, and as such, it must be supported by probable cause in order to be valid. *See Kaupp v. Texas*, 538 U.S. 626, 630 (2003). In order to determine whether a seizure has occurred, a court asks whether, in light of the circumstances surrounding the officer's actions, a reasonable person would have believed he was free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Where a person's Fourth Amendment right has been

_____

[9] The Court notes that the Mississippi Supreme Court did not engage in a discussion of this particular claim, even though it cited the argument. *See Branch I*, 882 So.2d at 60 ¶ 62. The decision, even though unexplained, is afforded deference. *See Harrington*, 131 S. Ct. at 784 (holding that a decision denying relief "unaccompanied by an explanation" must still be shown to have no reasonable basis in order for a petitioner to carry his burden).

violated, evidence obtained in violation of that right is generally inadmissible against him at trial as the "fruit" of the illegal activity. *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).

If Petitioner were bringing an independent Fourth Amendment claim, it would be barred by *Stone v. Powell*, 428 U.S. 465, 494 (1976), as he had a full and fair opportunity to litigate the issue of his arrest in State court. Inasmuch as Petitioner's claim is that counsel rendered ineffective assistance in failing to suppress the fruits of the allegedly unconstitutional arrest, and it is viable. *See Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986). However, in order to show ineffective assistance in these circumstances, Petitioner must first show that his Fourth Amendment claim has merit. *Id.* at 375.

Petitioner was twice questioned by law enforcement officers before he gave an inculpatory statement. When Petitioner was approached at his place of employment and asked to accompany Deputy Spellman to the sheriff's office for additional questioning, he voluntarily agreed. (*See, e.g.*, Trial Tr. vol. 5, 467). Petitioner was not under arrest at the time, though he was handcuffed in front of his body and placed in the back of the squad car for transport. (*See* Trial Tr. vol. 2, 34; Trial Tr. vol. 5, 466-67; Trial Tr. vol. 6, 657-59, 695, 732-33). Deputy Spellman testified that Petitioner was informed at that time that he was not under arrest but was being handcuffed solely for safety reasons. (Trial Tr. vol. 7, 735-36). Petitioner's voluntary interaction with law enforcement is not a seizure within meaning of Fourth Amendment. *See Mendenhall*, 466 U.S. at 557-58 (determining that a voluntary consent to accompany police is not an arrest requiring probable cause); *Morales v. New York*, 396 U.S. 102 (1961); *United States v. Webster*, 750 F.2d 307, 321 (5th Cir. 1984) (holding that a "voluntary trip to the police station for questioning does

19

not implicate the fourth amendment").

However, because law enforcement officials came to Petitioner's place of employment, handcuffed him, and transported him back to the sheriff's department to question him, it is arguable that Petitioner did not really believe that he had a choice but to cooperate. Assuming, without deciding, that Petitioner was subject to "arrest" at the time of his interrogation, it was invalid if not supported by probable cause. *See, e.g., Kaupp*, 538 U.S. at 631-32. Probable cause existed if the officers had "reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the petitioner had committed" a crime in light of all the circumstances. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). In this case, Petitioner gave facts that the officers objectively knew to be untrue, such as where he was during the early morning hours of the murder. The officers had spoken to numerous patrons of Dot's and knew that Petitioner had been there with Johnson in the early morning hours before Dot was killed. Additionally, Petitioner gave officers facts in the initial interview that were denied by Johnson, with whom Petitioner conceded he had spent the evening. These facts are sufficient to provide reasonable grounds to believe that Petitioner had been involved in the crime. *See, e.g., McBride v. Crime Stoppers*, 41 F.3d 661, 1994 WL 684541at *4 (5th Cir. 1994) (finding that inconsistent statements as to whereabouts constitute probable cause for arrest); *Thorson v. State*, 653 So.2d 876, 886 (Miss. 1994) (probable cause existed to arrest defendant without a warrant when he was last person to see victim alive and gave conflicting statements to police).

Defense counsel did argue in this case for the suppression of Petitioner's statement, and counsel's assistance is not rendered deficient by her failure to allege an invalid arrest as grounds. Because Petitioner has not shown a reasonable probability that his claim would have been

20

successful, he has also not demonstrated that he was prejudiced as a result of counsel's strategy. Moreover, the harm suffered when counsel is ineffective in suppressing reliable evidence is "not the denial of a fair and reliable adjudication of his guilt, but rather the absence of a windfall." *Kimmelman*, 477 U.S. at 396 (1986) (Powell, J., concurring). Therefore, Petitioner has not demonstrated that it was unreasonable for the State court to deny his *Strickland* claim on this issue, and it will be dismissed.

## C. Forensic evidence

Petitioner maintains that trial counsel rendered ineffective assistance in failing to challenge the State's forensic evidence linking Johnson to the crime, as Petitioner's custodial statement was the only evidentiary connection between Johnson and Petitioner. The Mississippi Supreme Court rejected Petitioner's claim on direct appeal. *See Branch I*, 882 So.2d at 62. Petitioner maintains that the court's decision is unreasonable, as trial counsel had a duty to secure experts who could present an alternate theory in an effort to create reasonable doubt. Counsel's failure was compounded, Petitioner maintains, by counsel's failure to cross-examine the State's DNA experts and subject the case to adversarial testing.

Jorden's blood was found on broken pieces of furniture wood discarded in the woods near her home, and wood with a similar appearance was found at Johnson's home. Jorden's blood was also found on clothing that police recovered from Johnson. Defense counsel Crawford moved at a pretrial hearing to suppress the DNA evidence obtained in the case, as it linked Johnson, but not Petitioner, to the crime. (*See* SCP vol. 1, 32-33). At trial, defense counsel objected to the introduction of the physical evidence, and the trial court determined the evidence was relevant and

more probative than prejudicial.  (*See* Trial Tr. vol. 6,  594, 600, 610, 612-14).[10]  Joe Andrews,

employed in the trace evidence section of the Mississippi Crime Laboratory, testified that the

wood pieces recovered from near the victim's house were originally part of the same piece, and

that the pieces of wood recovered from Johnson's home bore a consistent appearance with the

wood recovered near the crime scene.  (*See* Trial Tr. vol. 6, 585-95).  Forensic DNA analyst,

Chris Larsen, testified that the blood found on the wood,  Johnson's shoes, and Johnson's jeans

was consistent with the known DNA sample of Jorden.  (*See id.* at 617-28).[11]  Trial counsel did

not cross-examine these witnesses.

The record demonstrates that defense counsel did make efforts, although unsuccessful, to

suppress Petitioner's confession and the physical evidence in this case.  The defense theory at trial

was that Johnson killed the victim in this case, and the testimony established that the physical

evidence linked only Johnson to the crime.  Once the attempt to suppress Petitioner's confession

failed, the omission of the physical evidence linking only Johnson to the murder would not have

been exculpatory to Petitioner in light of his chosen defense.  Additionally, there is no basis to

assume that another expert's review of the DNA results would have revealed different

information, and the possibility that something could have been wrong with the testing will not

support an ineffective assistance of counsel claim.  *See Collier v. Cockrell*, 300 F.3d 577, 587 (5th

Cir. 2002) (holding that conclusory allegations of counsel's ineffectiveness do not raise a

---

[10] All of the evidence was allowed except Petitioner's shoes.  The court refused to admit
the shoes into evidence, as it could only be determined that there was human DNA on them.
(Trial Tr. vol. 6, 613-14).

[11] Amy Winters also testified regarding the standard process for collecting blood samples
that were followed in the case.  (Trial Tr. vol. 6, 585-89).

constitutional issue in federal habeas). Petitioner has failed to demonstrate that the decision of the Mississippi Supreme Court is unreasonable, and this claim will be dismissed.

## D. *Batson* objections

Petitioner was convicted and sentenced to death by an all white jury. He maintains that counsel rendered ineffective assistance by failing to challenge the State's use of three out of four peremptory challenges to exclude black venire members from the jury on the basis of race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). He maintains that counsel's failure to make an objection or make a record in this case prevented meaningful review of his claim on appeal, and that the Mississippi Supreme Court unreasonably rejected his claim by assessing the merits of his *Batson* claim rather than applying *Strickland*. On direct appeal, the Mississippi Supreme Court found Petitioner's claim barred for counsel's failure to raise it at trial, and it otherwise found the claim without merit, as Petitioner failed to make a prima facie case of racial discrimination. *See Branch I*, 882 So.2d at 58-60.

The record establishes that Petitioner's jury was selected out of the first twenty-eight persons remaining on the panel after challenges for cause were exercised, and only three of those potential jurors were black. (*See* Pet. Memo Ex. W; Trial Tr. vol. 4, 345-50). All three of the black potential jurors were peremptorily struck by the prosecution, and no challenge to the strikes was raised by defense counsel. (*See* Trial Tr. vol. 4, 350-51; Pet. Memo Ex. W). When defense counsel presented a motion for a new trial on July 16, 2002, Crawford made an ore tenus *Batson* motion. (*See* Trial Tr. vol. 8). She argued that defense counsel Stuckey handled that portion of the trial, and that the process went too quickly to allow her to talk to him about challenging the strikes on the basis of *Batson*. (*See id.* at 880-81). Stuckey informed the court that he did not

23

object because there were justifiable reasons to have the jurors excluded, which he recited to the trial court as to two of the jurors.  (*See id.* at 881-82).  Stuckey noted only a "justifiable reason" for the exclusion of the first juror.  (*See id*. at 881).  He believed that one of the jurors was completely unresponsive to questions regarding the death penalty, while another potential juror had been previously represented by defense counsel Crawford and had a sister previously convicted of shoplifting.  (*See id.*).  The trial court found that the matter had been waived under State law, and that Stuckey's statements as to why he did not raise a challenge "sufficiently answer[ed]" all of the *Batson* issues.  (*Id*. at 883).

Despite Respondents' contentions to the contrary, the Court does not find Petitioner's ineffective assistance claim procedurally barred from federal habeas review.  Trial counsel did not have to raise an allegation of his or  her own ineffectiveness under State law to preserve the issue.  *See Archer v. State*, 986 So.2d 95, 956 (Miss. 2008) ("[A] self-ineffectiveness claim is absolutely inappropriate").  Therefore, the Court considers the merits of Petitioner's claim.

The exercise of peremptory challenge in a racially discriminatory manner violates the Equal Protection Clause of the Fourteenth Amendment.  *Batson v. Kentucky*, 476 U.S. 79 (1986).  *Batson* established a three-part analysis for a defendant claiming racial discrimination in the prosecutor's use of peremptory challenges:  "(1) a defendant must make a prima facie showing that the prosecutor exercised his peremptory challenges on the basis of race; (2) the burden then shifts to the prosecutor to articulate a race-neutral reason for striking the juror in question; and (3) the trial court must determine whether the defendant carried his burden of proving purposeful discrimination."  *Moody v. Quarterman*, 476 F.3d 260, 266 (5th Cir. 2007) (citations omitted).

A petitioner's production of evidence  "sufficient to permit the trial judge to draw an

24

inference that discrimination has occurred" will allow the petitioner to move to the second step of the *Batson* inquiry. *Johnson v. California*, 545 U.S. 162, 170 (2005). A court must consider "all relevant circumstances" when determining whether a prima facie case of discrimination has been made, and that includes all of the information known to the parties at the time the strike was exercised. *Edmondson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 631 (1991). However, Petitioner does not make out a prima facie case just by demonstrating that the jury was not diverse. *See Soria v. Johnson*, 207 f.3d 232, 239 (5th Cir. 2000) (finding that a defendant must prove discrimination by more than the sole fact that minority venire-persons struck); *Lockett v. Anderson*, 230 F.3d 695, 707 (5th Cir. 2000) ("[M]ere cognizance of racial identity does not necessarily establish, or even imply, racial discrimination."). Petitioner fails to carry his burden simply by pointing out that the jury contained no black members and that there is no facially sufficient finding that a race-based pattern is absent. The burden is on Petitioner to make out the prima facie case and not upon the State to show the absence of one.

However, even if the Court were to assume that Petitioner made a prima facie case of discrimination that was not sufficiently rebutted by the prosecution, it notes that the "ultimate burden of persuasion" in this case belongs to Petitioner. *See Purkett v. Elem*, 514 U.S. 765, 768 (1995). There were three black potential jurors - Gatewood, Givens, and Williams - who were peremptorily struck by the prosecution in this case. (*See, e.g.*, Trial Tr. vol. 8, 882). A review of the record shows that Gatewood had been related by marriage to one of the witnesses in this case and expressed inconsistencies in her death penalty views. (*See* Trial Tr. vol. 4, 291, 312-13, 332). There is no record that Givens gave any voir dire responses. The voir dire responses of Williams indicate that defense counsel Crawford did previously represent her, and that she had a sister who

25

had been convicted of shoplifting. (*See* Trial Tr. vol. 3, 141, 161). The record confirms Stuckey's recount to the trial court of his reasons for not objecting to the strikes. Additionally, the Court notes that the trial judge indicated to the Mississippi Supreme Court that racial considerations were not apparent at trial. (*See* "Report of the Trial Judge Where Death Penalty Is Imposed"). The fact that a member of the defense team thought the strikes were justified is not, absent other proof, evidence of any collusion with the State to deny Petitioner a racially diverse jury. The Court notes that even if counsel performed deficiently in failing to communicate and agree on whether to make *Batson* objections, there is no indication in the record that Petitioner was prejudiced as a result. Because Petitioner has failed to demonstrate that potential jurors were excluded in a racially discriminatory manner, his ineffective assistance claim based on *Batson* also fails. *See Medellin v. Dretke*, 371 F.3d 270, 278 (5th Cir. 2004).

**E. Cumulative effect**

Petitioner maintains that the cumulative effect of trial counsel's errors warrants federal habeas relief. An accumulation of errors, which are individually harmless or otherwise non-reversible, may require reversal where they deny the defendant a fundamentally fair trial. *See, e.g.,United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998). The doctrine of cummulative error will allow habeas relief when errors of constitutional dimension have occurred, the matters are not procedurally barred, and the errors "so infected the entire trial that the resulting conviction violates due process." *Derden v. McNeel*, 978 F.3d 1453, 1454 (5th Cir. 1992). On direct appeal, the Mississippi Supreme Court held that "each of the foregoing assignments of error have been found to be without merit and we thus find that there was no cumulative error." *Branch I*, 882 So.2d at 58. Petitioner has not demonstrated that decision was unreasonable, and this claim shall

26

be dismissed.

## Certificate of Appealability

Under the AEDPA, Petitioner must obtain a certificate of appealability ("COA") before appealing this Court's decision denying federal habeas relief. 28 U.S.C. § 2253(c)(1). A COA will not issue unless Petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which Petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where a petitioner's claim has been denied on procedural grounds, Petitioner must additionally demonstrate that "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. This Court must issue or deny a COA upon its entry of an order adverse to Petitioner. *See* Rule 11 of the Rules Governing § 2254 Cases. The Court, resolving in Petitioner's favor any doubt as to whether a COA should issue, determines that Petitioner has not demonstrated that reasonable jurists would debate its procedural and/or substantive rulings on the remaining claims raised by Petitioner. Therefore, a certificate of appealability will not issue.

## Conclusion

For the reasons stated herein, Petitioner is entitled to have his sentence of death vacated pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002) and *Chase v. State*, 873 So.2d 1013 (Miss. 2004). This Court will issue a Writ of Habeas Corpus unless, within sixty days of the date the Judgment in this case becomes final, the State of Mississippi vacates Petitioner's death sentence and imposes a sentence less than death. The remainder of Petitioner's claims do not warrant

27

federal habeas corpus relief and shall be dismissed. A separate judgment in accordance with this opinion shall issue today. Accordingly, it is hereby **ORDERED** that:

1. Relief on Petitioner's claim of mental retardation is **GRANTED**, and this Court will issue a Writ of Habeas Corpus unless, within sixty days of the date the Judgment in this case becomes final, the State of Mississippi vacates Petitioner's death sentence and imposes a sentence less than death.

2. Petitioner is **DENIED** an evidentiary hearing on his remaining claims.

3. All other federal habeas corpus relief requested by Petitioner is **DENIED**, and the remaining claims in the petition shall be **DISMISSED** with prejudice.

4. All pending motions are **DISMISSED** as moot.

5. Petitioner is **DENIED** a Certificate of Appealability on all claims raised in the petition not related to the sentencing phase of his trial.

6. A separate Judgment in conformity with this Opinion and Order shall issue today.

        **SO ORDERED**, **THIS** the 2nd day of December, 2011.

                            **/s/ MICHAEL P. MILLS**
                            **CHIEF JUDGE**
                            **UNITED STATES DISTRICT COURT**
                            **NORTHERN DISTRICT OF MISSISSIPPI**